Howard E. Goldfluss, J.
This case is another example of the obscure nature of CPL 1.20, which attempts to define peace officer status.
The defendant was employed by the Narcotic Addiction *624 Control Commission in June of 1970 as a narcotic correction officer.*
The defendant was arrested on August 12, 1974, and charged with possession of a loaded gun in violation of section 265.05 of the Penal Law. When the matter appeared before this court the defendant submitted a shield establishing proof of his employment. Upon questioning by the court, the defendant stated that he was assigned to Ridge Hill facility and that his duties there include the guarding of prisoners. He further stated that detainees at that institution are not at liberty to leave except in handcuffs or under some other restraint — and then only accompanied by a narcotic correction officer. Based upon these uncontroverted statements, it was held that the defendant’s occupation placed him in the category of a peace officer under CPL 1.20 (subd 33, par [h]), which defines a peace officer as follows: "An attendant, or an official, or guard of any state prison or of any penal correctional institution”. Since a peace officer may possess a weapon without a permit, the motion to dismiss the complaint was granted. This court so ruled because it was also concerned with the question of notice. Beside the lack of intent, it would have been manifestly unfair and inequitable for this defendant to be liable for arrest and conviction for possession of a weapon if the defendant truly believed that his duties required or permitted him to possess such weapon.
Subsequently thereto, the District Attorney moved to reargue the motion to dismiss. The People set forth the legal argument that the Ridge Hill institution is not a State prison or penal correctional institution and therefore does not endow the defendant with peace officer status. In addition, the People sought to introduce proof, which they failed to do at the arraignment, that the defendant did indeed have notice of specific prohibition against the possession or carrying of guns —that such notice was given him prior to his arrest — and that therefore his possession was intentionally violative of the law.
• At the time of his arrest the defendant was an employee of the Drug Addiction Control Commission. Article 81 of the Mental Hygiene Law established this agency for the purpose *625 of rehabilitating drug dependent persons in custodial institutions and in outpatient and aftercare centers.
The People cite Matter of Pannel v Jones (36 NY2d 339) and People v Fuller (24 NY2d 292) as their authority for the proposition that the institutions under the control and supervision of the commission cannot be defined as prisons or correctional institutions. These cases do not define the institutions as such because they involve determination of rights of the detainees under their custody and control. The court held in both instances that all of the procedural safeguards required in criminal prosecutions did not apply equally to those certified for treatment. To quote Judge Breitel in Pannel v Jones (supra, p 343): "The difference between the purposes of imprisonment for crime and rehabilitative confinement for narcotic addiction * * * allow for different and less restrictive procedure when outpatient status is sought to be revoked.” Inferentially, therefore, it must be assumed that the court, in denying the same degree of rights to a person confined to a D.A.C.C. institution, considered the latter as medical and rehabilitative only, and not a penal or correctional institution. Based on Judge Breitel's definition, this court is constrained to follow that reasoning.
A hearing was held on the motion to reargue as to the issue of notice to the defendant. Three witnesses were called by the People. The most relevant and significant testimony was given by Donald Caffero, who was the Chief Narcotic Officer at Ridge Hill at the time of the defendant’s arrest and at all times prior thereto. The People introduced into evidence a memorandum dated August 29, 1973, issued by Caffero, which he testified was distributed to all officers, read at lineups, and posted on bulletin boards. The memorandum was the text of Item 52 of the General Administration Manual, which stated as follows:
"PURCHASE OF WEAPONS BY EMPLOYEES
"Employment as a narcotic correction officer or as a narcotic aftercare officer does not convey the right to purchase a firearm or any other weapon. The display of an employee’s I.D. card or his shield for the purpose of identification in connection with the purchase of a weapon or to influence the sale of a weapon to a N.A.C.C. employee is a misuse of N.A.C.C. I.D. card and/or shield and is prohibited.
"An employee who misrepresents his status by display of his shield, I.D. card, or by any other means to purchase a weapon *626 may be subject to prosecution by local authorities and to disciplinary action by the Commission.”
Caffero further testified that it was normal procedure to have memoranda of this nature handed to the men and have them affix their signatures. Caffero testified that the defendant’s supervisor told Caffero that Simmons refused to sign the memorandum. Simmons testified in that regard, and he admitted receiving the memorandum but refused to sign it because "I could not understand it.”
The cumulative evidence submitted at the hearing has convinced this court that had such evidence of notice to the defendant been offered at the arraignment, it would have ruled otherwise. It is reasonable to conclude from such testimony that the defendant knew, or should have known, that the possession of a gun by him was prohibited, and if he continued to possess such weapon it was done at his own risk. This conclusion, and the interpretation of Pannel v Jones and People v Fuller (supra), must cause this court to reverse itself. However, evidence at the hearing underscores a basic inequity which deserves comment.
Witnesses called by the People conceded that the duties of a narcotic correction officer include the maintenance of security, and that as such he guards detainees. The word "detainees” is significant. Whether these people are there for medical treatment or for some other reason does not affect their status, as far as their liberty is concerned. They are not free to leave. They are in custody — and although some of the institutions under the control of the commission have a higher level of security than others, the fact remains that they are, in every sense of the word, prisoners. They are in Ridge Hill by virtue of court order, civil or criminal, and if they abscond, warrants are issued and transmitted for their apprehension. The narcotic correction officer, according to testimony of officials of the commission and officers, has custody of these persons en route between the institutions and court appearances. He also guards them in outside facilities such as hospitals. In every instance stated, it is the narcotic correction officer’s duty and responsibility to secure the detainee against escape.
If the detainee manages to escape the facility, the narcotic correction officers are requested to search the surrounding area and to apprehend him. Although this is not a direct responsibility of the officer, it nevertheless is encouraged by his employers. One officer testifying for the defendant de *627 scribed an instance occurring on August 21, 1975, in which two detainees "hit the fence between post 5 and 6” — that he and other officers went after them — and that if he was alone when they were apprehended there was no way he could cope with both of them. Accepting the fact that Ridge Hill is not a State prison or a penal correctional institution, the defendant is violating CPL 1.20 because he does not come within the definition of paragraph (h) of subdivision 33. It is not the intent of this court to construe the statute so that the right to possess firearms is expanded unnecessarily. This court is well aware of the danger to our society by virtue of the increased unlawful possession and use of firearms. But in view of the testimony at the hearing, it is difficult to understand the status of the hybrid classification that the commission gives its narcotic correction officers. At the hearing, officials of the commission testified that it employs a squad of special warrant officers who are permitted to carry firearms, and their sole purpose is to seek out and apprehend escapees "in the community.” Therefore, by this distinction they sought to justify the right of possession of firearms to warrant officers only. This is a distinction without a difference. A narcotic correction officer has a duty to resist any effort by his charge to escape. It is not without the realm of possibility that the escapee or those who may aid the escapee may be armed. If such a confrontation occurs the officer is in extreme jeopardy without the means to control the situation until help arrives. The inequity described herein calls out for legislative change. Either the duties of the narcotic correction officers should be. modified to eliminate the responsibility of the narcotic correction officer for escape, or give him the means to carry out that responsibility.
Call the individuals these officers guard medical patients or prisoners. The label given to them does not alter his responsibility, nor does it change the personal physical jeopardy he faces in the normal execution of his assigned duties. These duties for all practical purposes make him a peace officer in every sense of the term. It violates common sense to say that he is not — but more important — it continues to place him in an untenable position which is obviously unfair and unjust.
The commission has every right to designate which of its personnel may possess firearms. It does not have the right to make that distinction if the exposure to physical risk is substantially the same to all.
*628 On the law and the facts elicited at the hearing, and within the inherent authority of the court, the complaint herein is reinstated and the case is restored to the calendar for further prosecution and proceedings (Matter of Krum v Hogan, 69 Misc 2d 656; CPL 170.40).
The defendant is hereby ordered to appear in Part 1-C of this court for a preliminary hearing on March 17, 1976, in accord with the opinion filed herein.

 The Legislature has changed the name of the commission twice since the date of the defendant’s original employment. On September 1, 1973 it became the Drug Addiction Control Commission. Since April 1, 1975 to date, it is known as the Office of Drug Abuse Services.